**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| ANTERO RESOURCES CORPORATION; MU MARKETING LLC, | ) ) ) | |
| *Petitioners*, | ) ) | No. 24-1076 |
| v. | ) ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) | |
| *Respondent*. | ) | |

## PETITION FOR REVIEW

Pursuant to Section 19(b) of the Natural Gas Act ("NGA"), 15 U.S.C.

§ 717r(b); Rule 15(a) of the Federal Rules of Appellate Procedure; and D.C.

Circuit Rule 15, Antero Resources Corporation and MU Marketing LLC

(collectively, the "Antero Parties") petition this Court for review of the following

order of the Federal Energy Regulatory Commission:

- *Tennessee Gas Pipeline Company, L.L.C.*, Docket No. RP21-552-000, Order Affirming Initial Decision, 186 FERC ¶ 61,069 (2024) ("Order") (attached as Ex. A).

The Antero Parties were intervenors before the Commission and timely

requested rehearing of the Order. This petition is timely because it was filed

within 60 days of March 28, 2024, the date on which the Antero Parties' rehearing

request was denied by operation of law. *See* 15 U.S.C. § 717r(a)–(b); *Allegheny*

*Def. Project v. FERC*, 964 F.3d 1, 5 (D.C. Cir. 2020) (en banc); *see also Tennessee Gas Pipeline Company, L.L.C.*, Docket No. RP21-552-002, Notice of Denial of Rehearing by Operation of Law, 186 FERC ¶ 62,162 (2024) (attached as Ex. B). This Court has jurisdiction, and venue in this Court is proper, under 15 U.S.C. § 717r(b).

A copy of the order is attached as Exhibit A.  A copy of the notice of denial of rehearing by operation of law is attached as Exhibit B.  Also attached are: (1) the Corporate Disclosure Statement required by Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, and (2) a Certificate of Service.

Dated: April 1, 2024                    Respectfully submitted,

                                        */s/ Charlotte H. Taylor*
                                        Charlotte H. Taylor
                                        JONES DAY
                                        51 Louisiana Ave. NW
                                        Washington, DC 20001
                                        (202) 879-3939  (phone)
                                        (202) 626-1700 (fax)
                                        ctaylor@jonesday.com

                                        James E. Olson
                                        JONES DAY
                                        717 Texas St. #3300
                                        Houston, TX 77002
                                        (832) 239-3866 (phone)
                                        (832) 239-3600 (fax)
                                        jolson@jonesday.com

                                        *Counsel for Antero Resources Corporation
                                        and MU Marketing LLC*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ANTERO RESOURCES CORPORATION; ) <br> MU MARKETING LLC, ) <br> ) <br> *Petitioners*, ) <br> ) <br> v. ) <br> ) <br> FEDERAL ENERGY REGULATORY ) <br> COMMISSION, ) <br> ) <br> *Respondent*. ) | No. 24-1076 |

## CORPORATE DISCLOSURE STATEMENT OF
## ANTERO RESOURCES CORPORATION AND MU MARKETING LLC

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Antero Resources Corporation ("Antero") and MU Marketing LLC ("MU") hereby state as follows:

Antero is a corporation organized and existing under the laws of the State of Delaware. Antero maintains its principal place of business at 1615 Wynkoop Street, Denver, Colorado 80202. Antero is a natural gas producer in the Marcellus and Utica Shale plays.

Antero is a publicly traded company. Fidelity Management & Research Company, LLC owns more than 10% of Antero.

MU is a wholly owned subsidiary of Antero.

Dated: April 1, 2024

Respectfully submitted,

*/s/ Charlotte H. Taylor*
Charlotte H. Taylor
JONES DAY

*Counsel for Antero Resources Corporation
and MU Marketing LLC*

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANTERO RESOURCES CORPORATION; )
MU MARKETING LLC, )
 )
  *Petitioners*, )
 ) No. 24-1076
  v. )
 )
FEDERAL ENERGY REGULATORY )
COMMISSION, )
 )
  *Respondent*. )

## CERTIFICATE OF SERVICE

Pursuant to Rules 15(c) and 25(d) of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 25(f), I hereby certify that on April 1, 2024, I caused a copy of the foregoing Petition for Review and Corporate Disclosure Statement to be served by e-mail on all parties in the underlying administrative proceedings that are listed on the official service list of the Federal Energy Regulatory Commission Docket No. RP21-552-000.

I further certify that, in compliance with 18 C.F.R. § 385.2012, I caused a copy of the Petition for Review and Corporate Disclosure Statement to be served, via UPS overnight service, on Respondent at the following address:

 Debbie-Anne Reese
 Office of the Secretary
 Federal Energy Regulatory Commission
 888 First Street, NE
 Washington, DC 20426

Robert H. Solomon
Solicitor
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426

Dated: April 1, 2024                    Respectfully submitted,

                                        */s/ Charlotte H. Taylor*
                                        Charlotte H. Taylor
                                        JONES DAY

                                        *Counsel for Antero Resources Corporation*
                                        *and MU Marketing LLC*

EXHIBIT A

*Tennessee Gas Pipeline Company, L.L.C.*, Docket No. RP21-552-000,
Order Affirming Initial Decision, 186 FERC ¶ 61,069 (2024)

186 FERC ¶ 61,069
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Willie L. Phillips, Acting Chairman;
Allison Clements and Mark C. Christie.

| | |
|---|---|
| Tennessee Gas Pipeline Company, L.L.C. | Docket No.  RP21-552-000 |

ORDER AFFIRMING INITIAL DECISION

(Issued January 26, 2024)

1.     This order addresses briefs on and opposing exceptions to an Initial Decision issued on June 15, 2022,[1] by the Presiding Administrative Law Judge (ALJ) in the above-captioned proceeding addressing whether the fuel and loss retention percentages (F&LR) and the electric power cost rates (EPCR) proposed in Tennessee Gas Pipeline Company, L.L.C.'s (Tennessee) annual fuel filing submitted on March 1, 2021, are just and reasonable.[2]  As discussed below, we affirm the Initial Decision.

I.     **Background**

A.     **Tennessee's Fuel Adjustment Mechanism**

2.     Tennessee operates an interstate natural gas pipeline system that provides transportation and storage services subject to the Commission's jurisdiction.[3] Tennessee's system includes approximately 11,800 miles of pipeline and 516 compression units across 83 compressor stations.[4]  The pipeline system has a design capacity of approximately 12.1 billion cubic feet per day and "extends from the natural

---

[1] *Tenn. Gas Pipeline Co.*, 179 FERC ¶ 63,024 (2022) (Initial Decision).

[2] Tennessee Gas Pipeline Co. L.L.C., Annual Fuel Adjustment Filing, Docket No. RP21-552-000 (Mar. 1, 2021) (2021 Fuel Filing).

[3] *Tenn. Gas Pipeline Co.*, 174 FERC ¶ 61,256, at P 1 (2021) (Hearing Order); Joint Statement at 3 (JSF.1).

[4] Ex. TGP-0001 at 4:12–14 (Oblitas Direct); Joint Statement at 3 (JSF.1).

gas producing regions of Louisiana, the Gulf of Mexico and south Texas to the northeast region of the United States."[5]

3.      The compression facilities are required to compress the natural gas flowing on the pipeline so that requisite system pressure is maintained.[6]  When its compressor units are operated, Tennessee incurs fuel and electric power costs.[7]  Tennessee operates its system on an integrated basis, which it claims optimizes compressor unit use for fuel efficiency to benefit all shippers.[8]  Therefore, individual compressor units are not reserved for specific projects or shippers.[9]  Instead, all units are operated to serve the entire system most efficiently.[10]

4.      Tennessee's tariff includes a cost recovery tracker designed to recoup the fuel and electric power costs for operating its compressors, such that Tennessee remains economically neutral for this operational activity.[11]  This tracker is set forth in Article XXXVII of the General Terms and Conditions (GT&C) of the tariff and is specifically referred to as the "Fuel Adjustment Mechanism."[12]  It consists of two component rate categories, the F&LR and EPCR.[13]  Tennessee's tariff requires it to file with the

---

[5] Ex. TGP-0001 at 4:14–18 (Oblitas Direct); Joint Statement at 3 (JSF.1).

[6] Ex. TGP-0001 at 5:3–5 (Oblitas Direct); Joint Statement at 3 (JSF.2).

[7] Ex. TGP-0001 at 5:2–3 (Oblitas Direct); Joint Statement at 3 (JSF.2).

[8] Ex. TGP-0001 at 5:6–9 (Oblitas Direct); Joint Statement at 3 (JSF.3).

[9] Ex. TGP-0001 at 5:9–10 (Oblitas Direct); Joint Statement at 3 (JSF.3).

[10] Ex. TGP-0001 at 5:9–11 (Oblitas Direct); Joint Statement at 3 (JSF.3).

[11] Ex. TGP-0001 at 5:12–20 (Oblitas Direct); Joint Statement at 3-4 (JSF.4 & JSF.6).

[12] Ex. TGP-0001 at 5:14–20 (Oblitas Direct); Joint Statement at 3 (JSF.4).

[13] Ex. TGP-0001 at 6:4–5 (Oblitas Direct); Hearing Order, 174 FERC ¶ 61,256 at P 2.  Tennessee's tariff refers to F&LR and EPCR as two, separate components of its Fuel Adjustment Mechanism.  Tennessee, TGP Tariffs, Sheet No. 400, General Terms & Conditions Fuel Adjustment Mechanism (3.0.0).  The record and pleadings at times refer to the F&LR as "fuel" costs and separately refer to EPCR as "electric power" costs. Initial Decision, 179 FERC ¶ 63,024 at P 7 (citing Ex. TGP-0001 at 13:10–13 (Oblitas Direct)); *see also* Tennessee, TGP Tariffs, Eighteenth Revised Sheet No. 32, (Fuel and EPCR) (20.1.0) (referring to "FUEL AND EPCR" while further breaking down such costs to "F&LR" and "EPCR").  More commonly, however, the record and pleadings use

Commission annually to revise its F&LR and EPCR, with the proposed rates to be effective April 1 of each year.[14]

5.      The F&LR "is designed to recover:  (a) fuel used at compressor stations and for other utility purposes, and fuel provided to third parties pursuant to transportation and/or storage agreements entered into by Tennessee, and (b) lost and unaccounted for gas."[15]  It is denominated and recovered in the form of a percentage, specifically, a percentage of the natural gas delivered into the system.[16]

6.      The EPCR "is designed to recover costs incurred for electric power, which are recorded in FERC Accounts 819 and 855, and incurred for the operation of Tennessee's compressor stations with electric motor prime movers and electric power cost surcharges paid to third parties pursuant to transportation and/or storage agreements entered into by Tennessee."[17]  It is denominated and recovered in dollars per dekatherm (Dth).[18]

## B.      Tennessee's Broad Run Expansion Project

7.      On January 30, 2015, Tennessee sought authorization to construct and operate certain compression facilities as part of a two-part expansion project, namely to:  "(1) increase firm incremental transportation service on the Tennessee system by 200,000 dekatherms per day (Dth/d) (Market Component); and (2) replace older, less efficient compression facilities with more efficient and cleaner burning compressor units

---

"the term 'fuel' to refer to both the natural gas and electric power used to supply [Tennessee's] compressor stations."  Initial Decision, 179 FERC ¶ 63,024 at P 7 (quoting briefs).  Consistent with the Initial Decision, this Order generally relies on the generic term "fuel" to refer to both categories of Tennessee's Fuel Adjustment Mechanism, absent certain instances when further delineation of the term "fuel" into F&LR and EPCR is relevant to our determination.  *Id.*

[14] Tennessee, TGP Tariffs, Sheet No. 400, General Terms & Conditions art. XXXVII Fuel Adjustment Mechanism (3.0.0), § 3.

[15] Joint Statement at 4 (JSF.7) (citing Tennessee,  TGP Tariffs, Sheet No. 400, General Terms & Conditions Fuel Adjustment Mechanism (3.0.0), § 2).

[16] Joint Statement at 4 (JSF.7); Hearing Order, 174 FERC ¶ 61,256 at P 2.

[17] Joint Statement at 4 (JSF.7) (citing Tennessee, TGP Tariffs, Sheet No. 400, General Terms & Conditions Fuel Adjustment Mechanism (3.0.0), § 2).

[18] *Id.* (JSF.7); Hearing Order, 174 FERC ¶ 61,256 at P 2.

(Replacement Component)."[19]   The issues in this Order are limited to the fuel rates for the Market Component of the expansion project, which is referred to as the "Broad Run Expansion Project" or the "Expansion Project."

8.     Following the execution of a precedent agreement and the conclusion of an open season, Antero Resources Corporation (Antero) was awarded and subscribed to 100% of the capacity created by the Broad Run Expansion Project.[20]   In the 2016 Certificate Order approving the project, the Commission stated that "[t]he proposed expansion facilities are designed to provide incremental service to meet the needs of the project shipper, Antero."[21]

9.     Antero's firm transportation service agreement for the 200,000 Dth/d expansion service states that Antero must pay the "tariff fuel and electric power cost charges applicable to service on the Market Component facilities" of the Expansion Project.[22]   In the certificate proceeding for the Expansion Project, Tennessee originally proposed rolled-in fuel rates, arguing that there was no increase in general system fuel rates when it compared:  (a) the pre-expansion general system fuel rate based on peak day design conditions to (b) the post-expansion general system fuel rate based on current operating conditions.[23]   In the 2016 Certificate Order, the Commission rejected Tennessee's argument that it is appropriate to assess the project's impact on fuel rates based on a comparison of a pre-expansion fuel rate based on one criterion, e.g., peak day conditions, with a post-expansion fuel rate based on a different criterion, e.g., current operating conditions.[24]   Accordingly, the Commission rejected the proposal to roll in the fuel costs of the Expansion Project into Tennessee's system-wide fuel rates, finding that rolling in such costs "may result in the project being subsidized by existing customers."[25]   The Commission instead required "Tennessee to separately identify the incremental fuel

---

[19] *Tenn. Gas Pipeline Co.*, 156 FERC ¶ 61,157, at P 3 (2016) (2016 Certificate Order), *reh'g denied*, 163 FERC ¶ 61,190 (2018) (Certificate Rehearing Order).

[20] 2016 Certificate Order, 156 FERC ¶ 61,157 at P 6 & n.7; Joint Statement at 5 (JSF.10).

[21] 2016 Certificate Order, 156 FERC ¶ 61,157 at P 19; *see also id.* P 4 (also referring to Antero as "the project shipper").

[22] Joint Statement at 5 (JSF.10).

[23] 2016 Certificate Order, 156 FERC ¶ 61,157 at P 31.

[24] *Id.* P 33

[25] *Id.*

associated with its project and to develop and propose incremental fuel rates for the project."[26]

10.     On July 13, 2018, Tennessee filed revised tariff records in compliance with the Commission's 2016 Certificate Order.[27]  Tennessee proposed a composite fuel curve methodology to establish the initial incremental F&LR and EPCR for service on the Expansion Project facilities.[28]  Using this methodology, Tennessee correlated the relationship between natural gas throughput on the pipeline and fuel consumption.[29]  Tennessee evaluated this relationship for each of its pipeline segments located on the primary path of the Expansion Project.[30]  The methodology relied on several hydraulic studies that modeled fuel utilization at various throughput load factors.[31]  The studies indicated that as throughput increases on Tennessee's system, horsepower utilization, and in turn, fuel consumption, also increases.[32]  The studies also documented that this increase proceeds on an exponential basis, as distinct from a linear progression.[33]  Therefore, at higher levels of throughput, significantly greater levels of horsepower, and in turn, fuel, are required to compress gas and maintain pressure.

11.     Using its composite fuel curve allocation methodology, Tennessee proposed to assign a portion of the total fuel and electric power costs incurred to operate the compressor stations along each relevant pipeline segment to Antero as the incremental system shipper.[34]  As between the incremental and general system shippers, the proposal assigned the last throughput flows, and in turn, the corresponding last fuel consumption

---

[26] *Id.*

[27] *Tenn. Gas Pipeline Co.*, Docket No. RP18-977-000, at 1 n.1 (Aug. 14, 2018) (delegated order) (August 2018 Order); Joint Statement at 6 (JSF.14).

[28] Joint Statement at 6 (JSF.15).

[29] *See id.* (JSF.15).

[30] *Id.* (JSF.15).

[31] *Id.* (JSF.15).

[32] *Id.* (JSF.16).

[33] *Id.* (JSF.16).

[34] *Id.* (JSF.17).

on the fuel curve, to Antero as the incremental system shipper.[35]  The remaining
throughput flows, and in turn, those associated fuel consumption costs, are assigned to
the general system shippers.[36]  This methodology resulted in Tennessee proposing an
initial incremental F&LR of 4.76% and an initial incremental EPCR of $0.0308 per
Dth.[37]  Tennessee's tariff sets forth specific F&LR and EPCR costs for "Broad Run
Expansion Project – Market Component (Z3-Z1)."[38]  After receiving no protests, the
Commission accepted the proposed rates.[39]

### C.    Procedural History

12.    Tennessee submitted its 2021 Fuel Filing on March 1, 2021, pursuant to section 4
of the Natural Gas Act (NGA) and Tennessee's tariff's Fuel Adjustment Mechanism.[40]
Tennessee's 2021 Fuel Filing revised its F&LR and EPCR, including the corresponding
rates for the Broad Run Expansion Project for which Antero is the only shipper.

13.    For the Expansion Project, Tennessee proposed an incremental F&LR of 7.62%
and an incremental EPCR of $0.0272 per Dth.[41]  For the general system shippers,
Tennessee proposed an F&LR of 2.43% and an EPCR of $0.0127 per Dth, both of which
correspond to transportation service taken from Zone 3 to Zone 1, the same path along
which the Expansion Project facilities are located.[42]  Tennessee states that these rates are
derived from an underlying methodology that is "based on the composite fuel curve
methodology" previously approved by the Commission but with a modification "to

---

[35] *Id*. (JSF.18).

[36] *Id*. (JSF.18).

[37] Ex. TGP-0001 at 19:13–18 (Oblitas Direct).

[38] Tennessee, TGP Tariffs, Eighteenth Revised Sheet No. 32.

[39] August 2018 Order at 1-2.

[40] 2021 Fuel Filing, Docket No. RP21-552-000, at 1, 3; Tennessee, FERC NGA
Gas Tariff, TGP Tariffs Sheet No. 400 General Terms & Conditions Fuel Adjustment
Mechanism (3.0.0).

[41] Ex. TGP-0001 at 29:1–4 (Oblitas Direct); Joint Statement at 9 (JSF.30).

[42] Joint Statement at 9 (JSF.30).

account for the fuel savings associated with the more efficient [Expansion] Project facilities."[43]

14.     On March 15, 2021, Antero filed a protest to the 2021 Fuel Filing.[44]  Antero asserted that Tennessee's proposed modifications to its fuel methodology did not remedy the cross-subsidization that Antero claims exist with respect to its fuel rates.  Antero stated that it worked with Tennessee on updated fuel studies and requested that the Commission adopt Antero's alternative incremental fuel methodology, which it called its "Revised Allocation Methodology."[45]  In the alternative to adopting Antero's alternative rates, Antero requested that the proceeding be set for a technical conference.  No other protests were filed.  On March 31, 2021, the Commission accepted and suspended Tennessee's proposed rates to be effective April 1, 2021, subject to refund and the outcome of hearing procedures.[46]  The hearing was conducted on January 12, 2022.[47]  On June 15, 2022, the ALJ issued an Initial Decision.  On July 15, 2022, Antero filed a brief on exceptions.  On August 4, 2022, Tennessee, the Shipper Group[48] and Commission trial staff (Trial Staff) filed briefs opposing exceptions.

---

[43] Hearing Order, 174 FERC ¶ 61,256 at P 5.

[44] *Id*. P 7.

[45] Antero Protest at 13 (March 16, 2021).  According to Antero, its Revised Allocation Methodology separately charges Antero an incremental surcharge that is set at zero until the forecasted throughput exceeds a "Threshold Capacity" calculated by Antero from its updated fuel studies.  *Id*.  Antero asserts that an incremental surcharge is then attributed to Antero based on the fuel curve immediately above when forecasted throughput exceeds the Threshold Capacity.  *Id*.  Antero argued in its Protest that the incremental surcharge for the Market Component should be set at zero in this proceeding because the forecasted total throughput on the system within the Primary Path is less than the Threshold Capacity.  *Id*.

[46] *Id*. P 1.

[47] Initial Decision, 179 FERC ¶ 63,024 at P 30.

[48] For purposes of their brief, the Shipper Group consists of Consolidated Edison Company of New York, Inc.; Duke Energy Ohio; Duke Energy Kentucky; National Fuel Gas Distribution Corporation; New Jersey Natural Gas Company; NJR Energy Services Company; Orange & Rockland Utilities, Inc.; Piedmont Natural Gas; PSEG Energy Resources & Trade LLC; UGI Utilities, Inc.; and the Tennessee Customer Group, which includes the following entities: City of Bolivar, CenterPoint Energy; City of Clarksville Gas and Water Department, City of Clarksville; City of Corinth Public Utilities Commission; Delta Natural Gas Company, Inc.; Greater Dickson Gas Authority;

Docket No. RP21-552-000                                                      - 8 -

## II.  **Discussion**

15.     As reflected in the Initial Decision, the hearing and filings examined issues relating to whether the F&LR percentages and EPCR proposed by Tennessee in its 2021 Fuel Filing are just and reasonable.  As discussed below, we agree with the Initial Decision that Tennessee satisfied its NGA section 4 burden to demonstrate that its proposed F&LR and EPCR are just and reasonable, and therefore that Tennessee's proposed rates must be accepted and analysis of Antero's proposed alternative rates, which Antero advocated for in its March 15, 2021 Protest and subsequently during the hearing and related pleadings, under NGA section 5 is foreclosed.

### A.     **Initial Decision**

16.     The Initial Decision considered:  (i) the governing law and Commission precedent applicable to setting fuel rates that a natural gas pipeline charges its shippers, including the prior orders relating to fuel rates for the Broad Run Expansion Project; (ii) whether record evidence supported Tennessee's proposal to charge incremental fuel rates instead of rolling in the Broad Run Expansion Project fuel rates into general system rates; and (iii) Tennessee's composite fuel curve methodology and its allocation of fuel costs between general system shippers and the Expansion Project shipper Antero.  The Initial Decision concluded that Tennessee satisfied its NGA section 4 burden to demonstrate that its proposed F&LR and EPCR are just and reasonable.  The Commission concluded that Tennessee's proposed rates must be accepted, and that analysis of Antero's proposed alternative rates under NGA section 5 is foreclosed.[49]

#### 1.     **Commission Law and Precedent**

17.     The Initial Decision concluded that Commission precedent gives pipelines significant discretion in establishing natural gas pipeline fuel rates.[50]  In *Kern River Gas*

---

Hardeman Fayette Utility District; Henderson Utility Department; Holly Springs Utility Department; Humphreys County Utility District; Town of Linden; Morehead Utility Plant Board; Portland Natural Gas System, City of Portland; City of Russellville; Savannah Utilities; Springfield Gas System, City of Springfield; City of Waynesboro; West Tennessee Public Utility District; Athens Utilities; City of Florence, Alabama; Hartselle Utilities; City of Huntsville, Alabama; Municipal Gas Authority of Mississippi; North Alabama Gas District; Tuscumbia Utilities; and Sheffield Utilities.

[49] Initial Decision, 179 FERC ¶ 63,024 at P 125.

[50] *Id*. P 74.

*Transmission Co.*,[51] the Commission held, in the context of a pipeline expansion project such as the instant case, that "[a]bsolute precision from an allocation methodology . . . is not required.  Rather, as courts have stated, '[a]llocation of costs is not a matter for the slide-rule.  It involves judgment on a myriad of facts.'"[52]  The Initial Decision held that, nevertheless, "fuel rates must comply with the NGA's bedrock ratemaking principle of cost causation."[53]  This concept does not require complete precision, but rather that the fuel rates must "fall within the range of expectations for accuracy."[54]

18.     The Initial Decision referenced the Commission's 1999 Certificate Policy Statement[55] with respect to fuel rate matters that arise in the context of pipeline expansion projects.[56]  The Initial Decision held that Commission policy established a "No Financial Subsidies" policy under which expansion projects must be financially supported without subsidization from existing shippers.[57]  This non-subsidization requirement extends to a pipeline's fuel rate, as the Commission has emphasized that "the impact of the project on the pipeline's fuel usage must be a component of the Commission's analysis of whether existing shippers are subsidizing an expansion."[58]

19.     The Initial Decision stated that pursuant to the 1999 Certificate Policy Statement, expansion project ratemaking implicates two alternative pricing paradigms: rolled-in rates versus incremental rates.[59]  It observed that an expansion project's fuel costs are

---

[51] 115 FERC ¶ 61,236 (2006) (*Kern River*).

[52] Initial Decision, 179 FERC ¶ 63,024 at P 74 (citing *Kern River*, 115 FERC ¶ 61,236 at P 16).

[53] *Id*. P 75 (citing *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 267 (D.C. Cir. 2014)).

[54] *Id.* (citing *Millennium Pipeline Co*., 146 FERC ¶ 61,156, at P 24 (2014)).

[55] *Certification of New Interstate Nat. Gas Pipe Line Facilities*, 88 FERC ¶ 61,227 (1999) (1999 Certificate Policy Statement), *clarified*, 90 FERC ¶ 61,128 (2000) (Order Clarifying 1999 Certificate Policy Statement), *further clarified*, 92 FERC ¶ 61,094 (2000) (Order Further Clarifying 1999 Certificate Policy Statement).

[56] Initial Decision, 179 FERC ¶ 63,024 at P 77.

[57] *Id*.

[58] *Id.* (citing *Se. Supply Header, LLC,* 151 FERC ¶ 61,032, at P 10 (2015).

[59] Initial Decision, 179 FERC ¶ 63,024 at P 78.

among the cost categories that may be governed by one of these treatments.[60]  The Initial Decision also stated that the 1999 Certificate Policy Statement reversed the prior presumption in favor of rolled-in rates and instead favors incremental rates, thus establishing the preference that "existing shippers . . . should not be subject to increases in rates during the term of their existing contracts to reduce the rates faced by new shippers subscribing to expansion capacity."[61]

### 2. Prior orders relating to fuel rates for the Broad Run Expansion Project

20.     The Initial Decision noted that the Commission applied the 1999 Certificate Policy Statement when it issued a certificate of public convenience and necessity to Tennessee to construct the Broad Run Expansion Project.[62]  The Commission held that "[u]nder the [1999] Certificate Policy Statement, there is a presumption that incremental rates should be charged for proposed expansion capacity if the incremental rate will exceed the maximum system-wide rate."[63]

21.     As explained in the Initial Decision, the Commission also applied this presumption with respect to the Expansion Project's fuel rates.  Specifically, the Commission found that because rolling in the Expansion Project's fuel costs into Tennessee's system-wide fuel rates "may result in the project being subsidized by existing customers," Tennessee was required to separately identify the incremental fuel associated with its Expansion Project and to develop and propose *incremental fuel rates* for the Expansion Project.[64] As the Initial Decision stated, the Commission's finding was without prejudice to subsequent filings proposing rolled-in fuel rate treatment.[65]

---

[60] *Id*.

[61] *Id*. P 79 (quoting Order Clarifying 1999 Certificate Policy Statement, 90 FERC at 61,393).

[62] Initial Decision, 179 FERC ¶ 63,024 at P 80.

[63] 2016 Certificate Order, 156 FERC ¶ 61,157 at P 28.

[64] *Id*. P 33.

[65] Initial Decision, 179 FERC ¶ 63,024 at P 82.  As noted above, Tennessee filed revised tariff records on July 13, 2018, in compliance with the Commission's 2016 Certificate Order.  Tennessee proposed a composite fuel curve methodology to establish the initial *incremental* F&LR and EPCR for service on the Expansion Project facilities. *See supra* P 11.

22.     The Initial Decision observed that the Commission also rejected Tennessee's methodology comparing pre- and post-expansion fuel rates. Tennessee had originally proposed rolled-in fuel rates, arguing that there was no increase in fuel rates when it compared:  (a) the pre-expansion general system fuel rate based on peak day design conditions to (b) the post-expansion general system fuel rate based on current operating conditions.[66]  As the Initial Decision noted, the Commission rejected this comparison, finding that pre- and post-expansion fuel rates both must be calculated based on "current operating conditions."[67]  The Initial Decision noted that, because the record evidence in the certificate proceeding showed that the Broad Run Expansion Project could increase general system fuel rates under *current operating conditions*—this increased cost was "determinative of this issue" of rolled-in versus incremental fuel rates.[68]

### 3.     Record evidence supports incremental fuel rates instead of rolled-in rate treatment

23.     Applying the governing precedent, the Initial Decision found that evidence produced in the hearing continues to support charging incremental fuel rates instead of a rolled-in rate treatment for the Expansion Project. Determining that rolled-in versus incremental rates was a "mathematical test,"[69] the Initial Decision noted that the evidence, specifically Exhibit TGP-0014 and as memorialized in the Joint Statement's stipulated fact 34, indicates that "'under rolled-in rates, the Market Component facilities would have the effect of increasing the F&LR and EPCR for the general system shippers

---

[66] 2016 Certificate Order, 156 FERC ¶ 61,157 at P 31; Certificate Rehearing Order, 163 FERC ¶ 61,190 at P 75.

[67] Initial Decision, 179 FERC ¶ 63,024 at P 81.  *See also* 2016 Certificate Order, 156 FERC ¶ 61,157 at P 33 ("We are not persuaded by Tennessee's argument that it is appropriate to assess the project impact on fuel rates based on a comparison" between peak and current operating conditions); Certificate Rehearing Order, 163 FERC ¶ 61,190 at P 75 ("the Commission continues to believe that the appropriate comparison is between general system fuel rates under current operating conditions and estimated post-expansion fuel rates under current operating conditions").

[68] Initial Decision, 179 FERC ¶ 63,024 at P 82.  Tennessee acknowledged that the Broad Run Expansion Project could increase general system fuel rates under current operating conditions in a July 15, 2015 Data Response.  Certificate Rehearing Order, 163 FERC ¶ 61,190 at P 75.  The fuel study included in that response indicated that, based on current operating conditions, for Zone 3-1, the pre-expansion adjusted total fuel rate was 2.230%, compared to an estimated post-expansion adjusted total fuel rate of 2.390%.  *Id*.

[69] Initial Decision, 179 FERC ¶ 63,024 at P 86.

by up to 0.29% and \$0.0008 per Dth, respectively, depending on the transportation path.'"[70]  The Initial Decision referenced the data underlying that exhibit, which shows that the cumulative cost shift to general system shippers is "approximately 2,531,000 Dth of fuel and \$636,000 in electric power costs."[71]

24.     The Initial Decision also found that another exhibit, Tennessee's Exhibit TGP-0019, applied data consistent with the Commission's directive that the comparative test be implemented using "current operating conditions" as a uniform input metric.[72] Because that exhibit "computes a pre-expansion fuel rate of 2.37% and a post-expansion fuel rate of 2.72%," the Initial Decision concluded that such evidence "support[s] the conclusion that rolled-in fuel rate treatment would be improper and that incremental rates must be sustained."[73]  The Initial Decision examined the testimony and arguments of the protesting party, Antero, and noted that its own witness agreed with the statement that "rolling in of the fuel rates would cause general system shippers' fuel rates to rise."[74]

### 4. Composite fuel curve methodology and allocation of fuel costs between general system shippers and the Expansion Project shipper

25.     The Initial Decision concluded that Tennessee's methodology relies on a fuel curve to allocate transportation-related fuel and electric power costs between two shipper categories:  1) the general system shippers, and 2) shippers taking service on the Market Component of the Broad Run Expansion Project, i.e., Antero.[75]  The Initial Decision observed that Tennessee has relied on a fuel curve since its compliance filing in 2018, which set the initial incremental fuel rates for the Market Component of the Broad Run Expansion Project.[76]  The Initial Decision further found that Tennessee "devised its fuel

---

[70] *Id*. P 87 (quoting Joint Statement at 10 (JSF.34)).

[71] *Id*. P 87.

[72] *Id*. P 90.

[73] *Id*. P 91.

[74] *Id*. P 94 (quoting Tr. 92:4–6 (Sexton)).

[75] *Id*. P 101.

[76] *Id*.

curves using a common process" using pipeline simulation software to conduct "hydraulic studies that model fuel utilization at various throughput levels."[77]

26.     The Initial Decision noted that Tennessee produced multiple fuel curves for its 2021 Fuel Filing, more specifically, three hydraulic studies informing three corresponding fuel curves.[78]  According to the Initial Decision, Tennessee undertook this expanded analysis to better document the fuel consumption-throughput relationship on its system.

27.     Furthermore, the Initial Decision noted that the methodology Tennessee proposed in the 2021 Fuel Filing, as it did in past filings approved by this Commission, "continues to assign the last throughput flows on the fuel curve, and therefore the corresponding last fuel consumption, to the Expansion Project Shipper Antero."[79]  Antero contests this methodology.  Tennessee also proposed a "fuel savings crediting mechanism" in its 2021 Fuel Filing that constitutes a new addition to its methodology compared to its prior fuel filings.  The Initial Decision stated that this "new modification" would benefit the Expansion Project shipper Antero by reallocating to Antero "potential fuel efficiency savings that may occur under certain operating conditions from use of the Expansion Project facilities."[80]

### a.     Assigning Antero the last throughput on the fuel curve

28.     The Initial Decision found that the record in this proceeding supports Tennessee's continued assignment to Antero, as the Expansion Project shipper, the last throughput flows on the fuel curve.[81]  As the Initial Decision explained, Tennessee implemented the Expansion Project to make firm transportation service available to Antero.[82]  To do this, it added 130,021 horsepower to the relevant compression facilities "to move *incremental*

---

[77] *Id*. P 102.

[78] *Id*. P 103.

[79] *Id*. P 104 (citing TGP-0001 at 17 (Oblitas Direct)).

[80] *Id*. P 105.

[81] *Id*. P 106.

[82] *Id*. P 107.  The Initial Decision observed that Antero could have taken interruptible service on Tennessee but instead opted to support the Expansion Project and the resulting firm transportation service.  *Id*. P 110.

gas on the pipeline."[83]   According to the Initial Decision, the engineering principles in the record show that the enhanced horsepower was required to compress the additional volumes and maintain adequate pipeline pressure.  As the Initial Decision explained, the "expansion facilities were designed to meet peak day conditions, such that their design did not rely on the capacity provided by the pre-expansion facilities."  Antero's own pleadings in the hearing recognize that "'the project was designed to move throughput in excess of the pre-expansion capacity,'" and that, absent the Expansion Project facilities, there was insufficient capacity to provide Antero with the 200,000 Dth/day of firm service to which it subscribed.[84]   The Initial Decision stated that record evidence supports Tennessee's position that Antero's need for firm transportation caused Tennessee to build the Market Component facilities and that "cost causation requires that Antero be responsible for the fuel consumption its facilities make possible."[85]

29.     The Initial Decision found that "[t]he purpose of the enhanced compression . . . was so that additional gas could flow on the pipeline."[86]   According to the Initial Decision, "Antero continues to ship its gas pursuant to a 15-year firm contract that was only made possible by the Expansion Project designed to add more throughput to the pipeline."[87]   The Initial Decision concluded that "it is entirely appropriate and merited to place Antero's gas throughput flows, which are transacted under the umbrella of that firm contract, as the last flows on the fuel curve."[88]

30.     With respect to cost causation, the Initial Decision found that the Expansion Project increases fuel costs.[89]   It found evidence in the record that established "a non-linear, exponential relationship between gas throughput and fuel consumption."[90]   As the Initial Decision concluded, the "added throughput necessitates significantly heightened amounts of horsepower to compress the additional gas and achieve the

---

[83] *Id*. P 107 (emphasis in original).

[84] *Id*. (quoting Antero Initial Br. 14).

[85] *Id*. (quoting Tennessee Reply Br. 4–5).

[86] *Id*. P 108.

[87] *Id*. P 110.

[88] *Id*.

[89] *Id*. P 114.

[90] *Id*. P 115.

requisite level of pressure on the pipeline."[91]  It cited record evidence quantifying that the incremental shipper, Antero, causes Tennessee to incur "exponentially higher fuel costs per unit of throughput,"[92] and thus found it appropriate that "Antero must be allocated the marginal cost of fuel for its use of the system last flows on the fuel curve."[93]

### b.    Tennessee's new "fuel savings crediting mechanism"

31.    Regarding Tennessee's proposed "fuel savings crediting mechanism," the Initial Decision found that under certain operating conditions, the Expansion Project's compression facilities provide fuel efficiency benefits.[94]  According to the Initial Decision, such benefits materialized "once certain throughput levels are reached, specifically, when the 'general system operates at load factors equal to or greater than 80 percent of the pre- expansion capacity.'"[95]  The Initial Decision found that Tennessee's studies and its fuel curves enable Tennessee to quantify the fuel efficiency of the pre-expansion facilities versus the Expansion Project facilities, and then make a comparison.[96]

32.    The Initial Decision explained that Tennessee's proposed mechanism applies a credit to Antero when the Tennessee system operates at throughput levels equal to or greater than 80% of pre-expansion capacity.[97]  The Initial Decision stated that Tennessee determines the credit by applying a fuel savings adjustment factor, which in turn is calculated by comparing pre- and post-expansion fuel curves at applicable throughput levels.  This fuel factor varies between 5.4% and 11.5%, depending on whether throughput is at or above 100% of pre-expansion capacity, and the resulting credit lowers the fuel rate Antero "would otherwise be charged."[98]  As the Initial Decision observed, the "savings are not theoretical" – in fact Antero received a credit in the 2021 Fuel Filing

---

[91] *Id*. P 115.

[92] *Id*. (quoting Ex. TGP-0001 at 15:14–16 (Oblitas Direct)).

[93] *Id*.

[94] *Id*. P 116.

[95] *Id*. (quoting Ex. TGP-0001 at 25:19–21 (Oblitas Direct)).

[96] *Id*.

[97] *Id*. P 117.

[98] *Id*. P 118.

which reduced Antero's allocated fuel by 413,000 Dth.[99]  The Initial Decision concluded that Tennessee has satisfied its NGA section 4 burden to demonstrate that its 2021 Fuel Filing is just and reasonable.[100]  Given that Tennessee has satisfied its NGA section 4 burden, the Initial Decision ended its inquiry and accepts Tennessee's proposed rates.[101]

### B.    Briefs on Exceptions

33.    Antero argues that the Initial Decision erred by finding that Antero should be assigned "the last—i.e., most expensive—flows on the fuel curve to Antero without regard to which entity actually causes the fuel costs."[102]  Antero asserts that the Initial Decision's assigning marginal fuel costs to Antero is inconsistent with Commission precedent in that Commission policy does not require that an expansion shipper always pay for the marginal cost of gas being shipped on the pipeline.[103]  Antero argues that Tennessee's marginal pricing mechanism "does not actually reflect the changes in fuel costs *caused by the Expansion Project facilities*"; rather, it merely "accounts for shifts *along* the post-expansion fuel curve *caused by any shipper shipping more gas*."[104]  Antero states that, for example, "a system shipper could consistently use excess capacity on Tennessee's system and drive Antero's fuel rates higher, even if the amount of fuel used at the relevant throughput level is less than what would have been consumed without the Expansion."[105]  Antero claims that this "is cross-subsidization by Antero of the system shippers" and violates cost causation principles.[106]

34.    Antero admits that there would be a rate increase to system shippers if rolled-in rates were implemented.[107]  However, Antero asserts that this rate increase is "minor" and that the Initial Decision erred in relying on this finding because Antero is not advocating

---

[99] *Id*. (citing Ex. TGP-0001 at 30:5–8 (Oblitas Direct)).

[100] *Id*. PP 120-121.

[101] *Id*. P 121.

[102] Antero Br. on Exceptions at 7.

[103] *Id*. at 9.

[104] *Id*. at 10 (emphasis in original).

[105] *Id*. at 10.

[106] *Id*. at 10-11.

[107] *See id*. at 11-12.

for rolled-in rates in this case; rather, it is advocating for a different incremental fuel methodology.[108] Antero argues that "the question is not whether a hypothetical rolled-in pricing methodology . . . would be just and reasonable; the question is whether the methodology in the Tariff Filing itself is just and reasonable."[109] Antero asserts that the underlying methodology of assigning it the marginal cost of fuel is unjust and unreasonable for the reasons it explained earlier. Accordingly, Antero claims that the inquiry should be "how should the methodology be revised under NGA Section 5."[110]

35.    Antero also asserts that the Initial Decision erred in finding that Tennessee's fuel pricing mechanism properly accounts for the integrated nature of Tennessee's pipeline.[111] Rather, Antero claims "[t]he integrated nature of the pipeline is what causes Antero to subsidize system shippers under Tennessee's fuel pricing mechanism" and accordingly that the 2021 Fuel Filing is not just and reasonable.

36.    Antero also asserts that the Initial Decision's conclusion that Tennessee's proposed new fuel crediting mechanism "sufficiently accounts for the Expansion Project's impact on fuel rates is contrary to Commission policy and record evidence."[112] Antero asserts that this is error for the reasons it explained earlier asserting that assigning fuel costs to Antero is unjust and unreasonable.[113] Antero asserts that accepting the fuel crediting mechanism would be to accept a "massive subsidy that results from subjecting expansion shippers to a marginal fuel rate regardless of cost causation, then attempting to mitigate this subsidy with a trivial fuel credit," which is contrary to Commission no-subsidy policy.[114]

---

[108] *Id*. at 11.

[109] *Id*. at 12.

[110] *Id*. at 12.

[111] *Id*. at 13.

[112] *Id*. at 15.

[113] *Id*.

[114] *Id*. at 16.

37.     Finally, Antero argues that Tennessee has failed to meet its burden under NGA Section 4, and therefore the Commission should accept one of Antero's alternative fuel pricing mechanisms under NGA Section 5.[115]

### C.     Briefs Opposing Exceptions

38.     Tennessee, the Shipper Group, and Trial Staff filed briefs opposing exceptions. Tennessee asserts that the Initial Decision correctly applied the Commission's "mathematical test" to prevent subsidies of expansion shippers from existing shippers.[116] Tennessee argues that the "Commission computes the incremental rate that would result from segregating the costs associated with the expansion facilities, and compares it to the existing rolled-in rate," and that if the incremental rate is higher than the existing rolled-in rate, the pipeline must charge incremental rates.[117]  Tennessee asserts that Antero fails to define any improper subsidy that it claims is occurring "or provide any objective criteria for determining whether it is occurring."[118]

39.     Tennessee asserts that the Initial Decision correctly found that if rates were rolled-in, system shippers would have paid more in fuel and electric power costs, resulting in increases to system shippers' rates.[119]  Tennessee claims that Antero does not dispute that system shippers would experience higher fuel rates if fuel rates were rolled-in, and in fact agreed to these facts in the Joint Stipulation of Facts.[120]

40.     Tennessee argues that even when new compression provides incidental benefits to system shippers, the Commission has required pipelines to charge incremental fuel when, as is the situation in the instant case, the "'new compression was not necessary to provide service to the existing customers and thus did not provide any specific benefit to them.'"[121]  Tennessee cites *Transcontinental v. FERC* as rejecting the assertion that rolled-in fuel rates are justified when a system is operated on an "integrated basis" such

---

[115] *Id*. at 17-29.

[116] Tennessee Br. Opposing Exceptions at 10.

[117] *Id*. at 8-9.

[118] *Id*. at 9.

[119] *Id*. at 11.

[120] *Id*. at 11.

[121] *Id*. at 13 (quoting *Transcon. Gas Pipe Line Corp*., 161 FERC ¶ 61,012, at P 76 (2017)).

that "'all shippers benefit from added compression.'"[122] Thus Tennessee asserts that any generalized benefits related to the Market Component facilities do not negate the need for Antero to pay incremental fuel rates for those facilities.[123]

41.     With respect to cost causation, Tennessee asserts that uncontroverted data in the record "shows that more fuel is consumed on Tennessee's system as a result of its addition of the Market Component facilities, without which Antero could not have obtained firm service."[124] Tennessee argues that this additional fuel must be assigned to Antero, "for whom the Market Component facilities were built," stating that "*Antero's transportation causes the system to incur exponentially greater quantities of fuel at any level of throughput*, and Tennessee's fuel allocation methodology properly assigns these quantities to Antero."[125] Tennessee submits that the Initial Decision correctly rejected Antero's argument that Antero is not the cause of the incremental fuel assigned to it.[126] Tennessee cites testimony that "Antero is only assigned the marginal costs Tennessee incurs as a result of *Antero's use* of Tennessee's integrated system.'[127] Specifically, Tennessee cites testimony that "Tennessee allocates fuel using a composite fuel curve that models the relationship between throughput and fuel consumption, and shows that as throughput increases, fuel consumption increases exponentially."[128] Tennessee thus agrees that the Initial Decision "correctly explained that Antero must pay higher fuel costs than the general system shippers because it is Antero's incremental Market Component facilities that allow Tennessee to consume fuel at the higher (more fuel-intensive) points on the fuel curve."[129]

42.     Tennessee asserts that the expansion facilities consume more fuel than pre-expansion facilities providing similar transportation "because the pre-expansion facilities

--------

[122] *Id.* at 14 (quoting *Transcon. Gas Pipe Line Corp.*, 106 FERC ¶ 61,299, at P 123 (2004)).

[123] *Id.* at 14-15.

[124] *Id.* at 15.

[125] *Id.* (emphasis added).

[126] *Id.* at 16.

[127] *Id.* (quoting Ex. No. TGP-0018-REV at 12:4-6 (Oblitas Rebuttal) (emphasis in original).

[128] *Id.* at 16.

[129] *Id.* at 16-17.

include a combination of pipeline and compression facilities" whereas the expansion facilities are compression only.[130]  The difference in the facilities constructed for Antero, as the expansion shipper, compared to those constructed for the existing shippers results in the expansion facilities "having a fuel intensity of nearly three times that of comparable pre-expansion facilities."[131]  Tennessee explains that it allocates the fuel consumption associated with this greater fuel intensity to Antero, the expansion shipper, by assigning it the "last flow" on the fuel curve, appropriately resulting in Antero paying an incremental fuel rate that reflects the greater fuel intensity associated with its transportation.[132]  Accordingly, Tennessee advocates that the Initial Decision correctly found that composite fuel curve methodology and its assignment to Antero of the last flows on the fuel curve accurately reflect the project's impact and are supported by the facts in the record.[133]

43.     Tennessee argues that Antero's concept of "Threshold Capacity" is meaningless in that Antero's firm transportation causes the Tennessee system to consume more fuel than it otherwise would at any point on the fuel curve, regardless of whether fuel consumption exceeds the maximum possible fuel consumption that could have occurred prior to construction of the Market Component facilities.[134]  Tennessee explains "because the throughput-fuel relationship is exponential, Transportation of Antero's volumes forces Tennessee to consume outsized quantities of fuel in proportion to Antero's incremental throughput."[135]  For example, Tennessee states that if Antero's volumes cause a 13% increase in throughput, that causes Tennessee to use 38% more fuel.[136]  Tennessee submits that the Initial Decision correctly found that cost causation requires Antero to be assessed incremental fuel charges that reflect the fact that Antero's transportation causes the system to consume exponentially higher levels of fuel at any given level of

---

[130] *Id.* at 17.

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *Id.* at 19.

[135] *Id.* (citing Ex. TGP-0020).

[136] *Id.* (citing Ex. TGP-0020).  Tennessee states that when the system operates at a pre-expansion load factor of 78% (without Antero's volumes), fuel consumption per Dth of throughput is 0.60%, and when Antero's volumes are added to the system, resulting in a post-expansion load factor of 88%, fuel consumption per Dth of throughput rises to 0.74%.  *Id.*

throughput.[137]  Tennessee also asserts that the Initial Decision correctly found the proposed fuel crediting mechanism captures the efficiencies from the expansion facilities and credits them to Antero, which Antero's own witness affirmed.[138]

44.    Finally, Tennessee argues that although the Initial Decision correctly found that the 2021 Fuel Filing rates are just and reasonable, and therefore the Commission is not required to evaluate whether Antero's proposed alternatives are just and reasonable, neither of Antero's proposed alternative rates are just and reasonable.  First, Tennessee asserts that Antero is in fact seeking rolled-in rates because its proposal would result in Antero paying the same rates as general system shippers, and only pay an incremental fuel charge "if the forecasted annual average post-expansion load factor is equal or greater than 94.5%," which has never happened post expansion.[139]  Second, Tennessee argues that Antero's proposal is not an incremental rate, but rather would increase system shippers' rates, and thus, under Antero's proposal, shippers would subsidize Antero's use of the expansion facilities.[140]

45.    Trial Staff argues that the Initial Decision correctly applied Commission precedent in approving Tennessee's proposed 2021 Fuel Filing.  Trial Staff argued that the hearing witnesses agreed that rolling in fuel costs would result in a cost shift for general system shippers.[141]  Trial Staff asserts that Antero's allegation that other shippers are moving increased volumes and that such usage impacts fuel rates "has no support in the record."  Furthermore, Trial Staff argues that "[c]hanging usage patterns are not necessarily a basis for finding that Tennessee's proposal is unjust or unreasonable."[142]

46.    Trial Staff also argues that there is no support for Antero's claim that "all system shippers benefit from the Expansion Project's new compression" since Tennessee operates an integrated system.  Trial Staff points out that the Initial Decision considered that any efficiencies of the expansion facilities "are no match for the higher fuel consumption driven by Antero's throughput."[143]  Trial Staff also asserts that

---

[137] *Id*. at 19-20.

[138] *Id*. at 20.

[139] *Id*. at 22.

[140] *Id*. at 23.

[141] Trial Staff Br. Opposing Exceptions at 4-5.

[142] *Id*. at 5.

[143] *Id*. at 7 (quoting Initial Decision, 179 FERC ¶ 63,024 at P 114).

"Tennessee's fuel savings crediting mechanism sufficiently accounts for the Expansion Project's impact on fuel rates"[144] and concludes that because Tennessee met its NGA section 4 burden, Antero's arguments on brief regarding its proposed alternative rates are "unavailing."[145]

47.     The Shipper Group argues that the Initial Decision set forth extensive and detailed analyses of the factual and legal issues relating to Tennessee's proposed 2021 Fuel Filing and concludes correctly that such rates are just and reasonable.[146]  The Shipper Group asserts that Antero simply reiterates arguments in its brief that the Initial Decision already rejected.  The Shipper Group raises two points for consideration.  First, it argues that this is "not a hard case" as numerous directly applicable precedents require Antero to continue paying incremental fuel rates.[147]  Second, the Shipper Group argues that adopting Antero's proposed alternatives "vitiate the fundamental Commission-pledged obligation of providing rate stability to system customers."[148]  It asserts that such a deviation is unjustified especially in this case where "the incremental rates to Antero have been in effect for only a few years."[149]  The Shipper Group argues that deviating from the current incremental rates would create significant regulatory uncertainty and invite disputes in other certificate proceedings and re-litigation in subsequent pipeline rate proceedings.[150]

### D.     Commission Determination

48.     We affirm the Initial Decision's holding that Tennessee's 2021 Fuel Filing has been shown to be just and reasonable.  We also agree with the Initial Decision that, because Tennessee satisfied its NGA section 4 burden with respect to the 2021 Fuel Filing, we do not need to consider Antero's proposed alternative rates.[151]  It is well settled

---

[144] *Id*. at 8.

[145] *Id*. at 9.

[146] Shipper Group Br. Opposing Exceptions at 4.

[147] *Id*. at 4

[148] *Id*. at 5.

[149] *Id*.

[150] *Id*. at 5-6.

[151] Initial Decision, 179 FERC ¶ 63,024 at PP 124-125.  *See also Coal. for Fair Fuel Rates v. Columbia Gulf Transmission, LLC*, 178 FERC ¶ 61,081, at P 33 (2022) ("Before the Commission can assess the Coalition's proposed alternative, Columbia

that when a pipeline demonstrates that its proposed rates are just and reasonable, as we find here, those rates must be accepted, regardless of whether other just and reasonable rates may exist.[152]   Accordingly, we affirm the Initial Decision and adopt its reasoning without modification.

49.     Under the 1999 Certificate Policy Statement, the Commission held that the threshold question applicable to expansion projects on existing pipelines is whether the project can proceed without subsidies from existing customers.[153]   The no-subsidy policy "protect[s] captive customers from rate increases during the terms of their contracts that are unrelated to the costs associated with their service."[154]   As the Commission held, this no-subsidy policy will usually mean that the project would be incrementally priced.[155]   Thus, there is a presumption that incremental rates should be charged for proposed expansion facilities if the incremental rate will exceed the maximum system-wide rate.

50.     The Commission previously examined Tennessee's proposal to roll in the Expansion Facilities' fuel rates into general system rates.  In the 2016 Certificate Order, the Commission explained that when deciding whether to grant a pre-determination of rolled-in fuel rates for expansion facilities, the Commission compares the pipeline's estimated incremental fuel rates to the pipeline's existing system-wide fuel rates.[156]   The Commission explained that allowing rolled-in rate treatment when *estimated* incremental fuel rates for the project are higher than the existing system-wide fuel rates creates a possibility that existing customers would subsidize costs related to the expansion.[157]   Tennessee confirmed in the certificate proceeding that the Expansion Project might result

---

Gulf's existing practices must be found unjust and unreasonable, which is not the case here.  Thus, the Commission has no further obligation to review the Coalition's preferred alternative."); *Kern River Gas Transmission Co.*, 142 FERC ¶ 61,132, at P 26 (2013) ("[p]ursuant to NGA section 5, the Commission must satisfy a two-prong burden of proof when it seeks to change a pipeline's existing rates or practices: we must demonstrate:  (1) that the existing rate or practice is unjust and unreasonable; and (2) that the alternative rate or practice imposed by the Commission is just and reasonable").

[152] *Sea Robin Pipeline Co.*, Opinion No. 516, 137 FERC ¶ 61,201, at P 43 (2011).

[153] 1999 Certificate Policy Statement, 88 FERC at 61,745.

[154] Order Clarifying 1999 Certificate Policy Statement, 90 FERC at 61,392.

[155] 1999 Certificate Policy Statement, 88 FERC at 61,745.

[156] 2016 Certificate Order, 156 FERC ¶ 61,157 at P 33.

[157] *Id.*

in an increase in general system rates under current operating conditions.[158]  Because it found that rolling in fuel costs into Tennessee's system-wide fuel rates may result in the project being subsidized by existing customers, the Commission required Tennessee to develop incremental fuel rates for the Expansion Project when it filed its actual tariff records.[159]

51.     Since the 2016 Certificate Order, the Commission has consistently upheld incremental fuel rates for the Expansion Project facilities.  In 2018, Tennessee filed its initial tariff records as required by the Commission.[160]  Antero did not file a protest questioning Tennessee's fuel allocation methodology, which assigned the last flows on each pipeline segment to the Expansion Project facilities, on the basis that the expansion volumes are incremental to the general system throughput in the project's primary path. The Commission accepted Tennessee's 2018 filing in its August 2018 Order.[161]

52.     On March 1, 2019, as amended on March 5, 2019, Tennessee filed revised F&LR and EPCR.  Tennessee maintained the existing fuel rates for the Market Component in its 2019, which the Commission accepted without protest.[162]

53.     On February 27, 2020, Tennessee filed revised incremental F&LR and EPCR for service on the Market Component based on the methodology approved by the Commission in the August 2018 Order.[163]  Antero filed a motion to intervene and protest, claiming that Tennessee failed to establish that the adjusted rates were just and reasonable and challenging:  (i) the magnitude of the increase of the adjusted incremental charges, and (ii) whether Tennessee properly allocated fuel costs to the adjusted incremental F&LR and EPCR charges in light of operational data from the Market

---

[158] *Id.*

[159] *Id.*

[160] *See* August 2018 Order, Docket No. RP18-977-000 at 1-2.

[161] *Id.*

[162] *Tenn. Gas Pipeline Co.,* Docket No. RP19-801-000 (Mar. 29, 2019) (delegated order).  In the 2019 proceeding, Tennessee proposed to maintain the existing F&LR and EPCR because the facilities were placed in service in October 2018 and therefore Tennessee had limited operating data available for the Expansion Project.  Filing at 3 & n.14.

[163] *Tenn. Gas Pipeline Co. L.L.C.*, 170 FERC ¶ 61,285, at P 3 (2020) (March 2020 Order).

Document Accession #: 20240126-3023          Filed Date: 01/26/2024

Component.[164]  The Commission found that Tennessee calculated its F&LR percentages and EPCR consistent with its tariff and "prior approved Commission methodology, which Antero did not protest."[165]  The Commission found that Tennessee showed that the increase in the incremental F&LR and EPCR rates resulted from "higher throughput experienced on the segments along the Project's primary path as well as under-collections during the Base Period" and that the allocation methodology Tennessee employed "is consistent with that utilized in its 2018 Fuel Filing and supported by the exhibits filed in the instant filing."[166]  The Commission thus accepted the tariff records and rejected Antero's request for a technical conference.[167]

54.     The instant case represents Tennessee's fourth filing relating to fuel costs for the Market Component of the Broad Run Expansion Project and represents Antero's second protest of such rates.

55.     As an initial matter, we agree with the Initial Decision that, under Commission policy, the increased fuel costs attributable to the Expansion Project preclude rolled-in rate treatment for such fuel costs and support Tennessee's proposal to continue charging incremental fuel rates to the Expansion Project shipper Antero.[168]  The record evidence supports this conclusion.[169]  Indeed, the parties' stipulated facts state that if Tennessee had proposed rolled-in fuel and electric power rates in the 2021 Fuel Filing, it would have resulted in a cost shift to the general system shippers of approximately 2,531,000 Dth of fuel and $636,000 of electric power costs.  As a result, rolled-in rates would have resulted in increasing the F&LR and EPCR for the general system shippers by up to 0.29% and $0.0008 per Dth, respectively, depending on the transportation path.[170]

56.     Regarding whether Tennessee's proposed rates are just and reasonable, the Initial Decision observes there "are two core features of the composite fuel curve methodology in this proceeding" that Tennessee uses to establish incremental F&LR and EPCR

---

[164] *Id*. PP 10-11.

[165] *Id*. P 20.

[166] *Id*.

[167] *Id*. PP 21-22.

[168] Initial Decision, 179 FERC ¶ 63,024 at P 92.

[169] *See id*. PP 87-92, 94.

[170] Joint Statement at 10 (JSF.34).

Document Accession #: 20240126-3023          Filed Date: 01/26/2024

rates.[171]  First, Tennessee's proposed fuel rate methodology continues to assign the last flows on the fuel curve to Antero (as Tennessee's has done since it submitted its first rate filing in 2018).  Second, the 2021 Fuel Filing proposes to include a new methodology that adds a "fuel savings crediting mechanism" that reallocates to Antero potential fuel efficiency savings that may occur under certain operating conditions from use of the Expansion Project facilities.[172]  These features are central to our determination of whether Tennessee's 2021 F&LR and EPCR rates are just and reasonable.  We address each of these features below.

57.     With respect to the first feature, we find that Tennessee's proposed methodology continues to appropriately assign the last flows on the fuel curve to Antero.  As noted in the Initial Decision, Tennessee has always assigned Antero the last throughput flows on the fuel curve and the evidence in the record justifies maintaining this approach.[173]  The Expansion Project facilities were constructed for one shipper, Antero, and were required to provide the 200,000 Dth/d firm capacity Antero requested.[174]  Because Antero chose firm service, rather than interruptible service under the same path on Tennessee's general system, under Commission policy it is obligated to pay the incremental costs Tennessee incurs to ship those volumes without relying on subsidies from the general system shippers.

58.     Furthermore, as Tennessee explains, the Expansion Project facilities consume more fuel than pre-expansion facilities because such facilities are compression-only, whereas the pre-expansion facilities include a combination of pipeline and compression facilities.[175]  This results in the Expansion Project facilities "having a fuel intensity of nearly three times that of comparable pre-expansion facilities."[176]  Tennessee states that it allocates the fuel consumption associated with this greater fuel intensity to Antero by assigning it the "last flow" on the fuel curve, appropriately resulting in Antero paying an incremental fuel rate that reflects the greater fuel intensity associated with its

---

[171] Initial Decision, 179 FERC ¶ 63,024 at P 104.

[172] *Id*. PP 104-105.

[173] *Id*. P 106.  *See also* Joint Statement at 6 (JSF.18).

[174] Initial Decision, 179 FERC ¶ 63,024 at P 100 n.264 (citing Ex. TGP-0016 at 9:8–11 (Oblitas Answering)).  *See also id*. at 107; Joint Statement at 5 (JSF.10).

[175] Tennessee Br. Opposing Exceptions at 17. *See also* Initial Decision, 179 FERC ¶ 63,024 at P 112.

[176] Tennessee Br. Opposing Exceptions at 17.

transportation.[177]  In addition, the record shows that because the Expansion Project
facilities were constructed solely for Antero's benefit, Antero's throughput always places
system fuel consumption higher (to the right) on the fuel curve than it would be without
Antero's volumes.[178]  In other words, "Antero's firm transportation causes the Tennessee
system to consume more fuel than it otherwise would at *any point* on the fuel curve."[179]
These facts support the conclusion that, but for Antero's transportation volumes, the
system would show lower, non-linear compressor fuel usage.  Because it was Antero's
request for firm transportation that caused Tennessee to construct the (compression only)
Expansion Project facilities that allowed the system to reach the top of the exponential
fuel curve, "cost causation requires that Antero be responsible for the fuel consumption
its facilities make possible."[180]

59.     We are not persuaded by Antero's argument that isolating the marginal fuel costs
and assigning all of those to Antero violates cost causation principles.[181]  Rather, we find
persuasive Tennessee's witness' testimony that such allocation is in fact consistent with
cost causation.  We note that the parties agree that fuel consumption on Tennessee's
system increases on an exponential and not linear basis, and thus any increased flows
cause *exponentially higher* fuel use.[182]  As Tennessee's witness explained, when general
system shippers elect to transport gas, the exponentially higher fuel costs associated with
increased volumes are "borne by all general system shippers equally."[183]  As an
incremental shipper transporting gas on an integrated system, Antero's transportation
volumes similarly increase fuel costs for all general system shippers, and if fuel rates
were rolled-in, system shippers would subsidize Antero's fuel use.[184]  Tennessee's
witness concludes that it is appropriate to assign an incremental system shipper (Antero)
the "last flow," and the corresponding last fuel consumption on the fuel curve, in order to

---

[177] *Id.*

[178] *Id.* at 18.

[179] *Id.* at 19 (emphasis in original) (citing Ex. No. TGP-0016 at 7:19-20, 14:18-19
(Oblitas Answering) ("[A]t any given operating level for the general system shippers,
Antero's incremental volumes create exponentially higher fuel consumption.").

[180] *See* Initial Decision, 179 FERC ¶ 63,024 at P 107.

[181] Antero Br. On Exceptions at 13.

[182] Joint Statement at 6 (JSF.16).

[183] Ex. TGP-0016 at 10:20–11:2 (Oblitas Answering).

[184] *See id.* 11:6-9.

prevent the general system shippers from subsidizing the incremental system shipper's fuel costs.[185]  Accordingly, we find that assigning Antero, as the incremental shipper, the last flows on the fuel curve is just and reasonable.  Tennessee's resulting fuel rates, calculated using such methodology, are likewise just and reasonable and appropriately must be accepted.

60.     With respect to the second feature of Tennessee's fuel filing, we find that the Initial Decision correctly determined that Tennessee's proposed new "fuel savings crediting mechanism" is just and reasonable and should be accepted.[186]  The parties agree that Tennessee collaborated with Antero over a nine-month period prior to the 2021 Fuel Filing to determine whether any modifications of its fuel curve methodology was warranted.[187]  Tennessee performed three additional hydraulic studies of the compressor units located along the Expansion Project's primary path.[188]  The parties agree that based on these studies, when this portion of Tennessee's system operates at load factors equal to or greater than 80% of the pre-expansion capacity, use of the Market Component facilities in lieu of the pre-expansion facilities results in less fuel consumption overall.[189]

61.     The parties further agree that Tennessee's proposed fuel savings credit mechanism credits Antero, the incremental shipper, with potential fuel savings that may result from the use of the Market Component facilities by the general system shippers in instances when the general system operates at load factors equal to or greater than 80% of the pre-expansion capacity.[190]  Furthermore, the parties agree that the mechanism as applied in this filing in fact reduced the fuel use and electric power costs allocated to Antero, as the incremental system shipper, by approximately 15.7% and 8.4%, respectively, from the prior methodology.[191]  Thus, as the Initial Decision found, "[t]hese savings are not

---

[185] *Id*. 11:17-20.

[186] Initial Decision 179 FERC ¶ 63,024 at PP 120-121.

[187] Joint Statement at 7-8 (JSF.24).

[188] *Id*. (JSF.24).

[189] *Id*. at 8 (JSF.25).  The parties further agree that Antero conducted its own hydraulic modeling consistent with Tennessee's, and ultimately adopted Tennessee's hydraulic modeling to develop its updated fuel study.  *Id*. at 8 (JSF.26).

[190] *Id*. at 8 (JSF.28).

[191] *Id*. at 9-10 (JSF.33).

theoretical—the mechanism was operative based on the data in the 2021 Fuel Filing and reduced Antero's allocated fuel by 413,000 Dth."[192]

62.    We are not persuaded by Antero's argument that the fuel crediting mechanism does not "sufficiently account for the Expansion Project's impact on fuel rates."[193]  We find that the record evidence supports the opposite conclusion.  The credit applies at the points on the fuel curve where cost savings were demonstrated to occur, namely from "when the general system operates at load factors equal to or greater than 80 percent of the pre-expansion capacity."[194]  Antero does not dispute that savings occur at these levels.[195]

63.    Furthermore, as noted above, Tennessee performed additional hydraulic studies of the compressor units located along the Expansion Project's primary path—studies that Antero accepted.  The Initial Decision examined the data and resulting fuel curves, which were admitted into the record, and related testimony and evidence, and concluded that "[t]he design of these studies and the resulting fuel curves allowed Tennessee to quantify the fuel efficiency of the pre-expansion facilities versus the Expansion Project facilities, and then make a comparison."[196]  From its analysis of record data, the Initial Decision concluded that Tennessee's "methodology's incorporation of the fuel savings crediting mechanism accounts for this project impact and ensures that the impact is fully reflected in the charged rates" and that the crediting mechanism protects Antero "by decreasing its charged rate when the pertinent circumstances arise, so that it is not subsidizing the general system shippers."[197]  We find the record supports this conclusion.

64.    Antero does not cite any evidence that the fuel savings do not occur at the throughput levels they do, or that Tennessee's crediting mechanism fails to account for such savings.  Rather, Antero simply maintains that the Initial Decision was in error because assigning marginal fuel costs to Antero in the first place is unjust and

---

[192] Initial Decision, 179 FERC ¶ 63,024 at P 118.  The Initial Decision notes that Antero's own witness conceded the cost savings.  *See id*.

[193] Antero Br. On Exceptions at 15.

[194] Initial Decision, 179 FERC ¶ 63,024 at P 116 (citing Ex. TGP-0001 at 25:16-26:4 (Oblitas Direct)).

[195] *See* Joint Statement at 9 (JSF.25).

[196] Initial Decision, 179 FERC ¶ 63,024 at P 116.

[197] *Id*. P 117.

unreasonable.[198]  We disagree with Antero's assertion that assigning marginal fuel costs
to the incremental shipper, Antero, is unjust and unreasonable, and thus likewise reject
Antero's derivative claim that the fuel crediting mechanism fails to correct the allegedly
unjust and unreasonable marginal cost allocation.  Indeed, we find the record includes
substantial evidence that fuel savings from the Expansion Project facilities occur at load
factors equal to or greater than 80% of the pre-expansion capacity and that the fuel
crediting mechanism fairly credits these savings back to Antero.  For the reasons stated
above, based on our review of the record, we find that Tennessee's fuel crediting
mechanism is just and reasonable, and must be accepted.

65.     In summary, we agree with the Initial Decision that Tennessee has satisfied its
NGA section 4 burden to show that its rate proposal is just and reasonable.  As the Initial
Decision noted, and as explained above, the participants in this proceeding agree on
much of the underlying data and many of the pertinent facts in the record, including the
hydraulic studies, the resulting fuel curves, and the fact that the fuel curve is exponential
and not linear.[199]  We find that the record sufficiently supports Tennessee's fuel rate
methodology, including Tennessee's new proposal to credit certain fuel savings to Antero
at certain throughput.  For the reasons explained above, we find that Tennessee has
established that its 2021 Fuel Filing, including the Fuel Adjustment Mechanism, is just
and reasonable.  Our finding that Tennessee has satisfied its burden under NGA section 4
precludes the Commission from considering Antero's NGA section 5 alternatives.

The Commission orders:

        (A)     The findings on the issues addressed in the June 15, 2022, Initial Decision
are affirmed and adopted, as discussed in the body of this order.

By the Commission.

( S E A L )

                                        Debbie-Anne A. Reese,
                                        Acting Secretary.

---

[198] Antero Br. On Exceptions at 15 (the Initial Decision's finding that "net
ramifications" of the Expansion Project's efficiencies are overshadowed by the higher
fuel consumption driven by Antero's throughput is "error for the reasons explained above
regarding the unjust and unreasonable nature of assigning marginal fuel costs to
Antero"); *id.* at 16 ("[t]he Fuel Credit should be taken as a tacit admission that the
underlying methodology of using marginal pricing is unjust and unreasonable and must
be addressed in some way").

[199] Initial Decision, 179 FERC ¶ 63,024 at P 83.

EXHIBIT B

*Tennessee Gas Pipeline Company, L.L.C.*, Docket No. RP21-552-002, Notice of
Denial of Rehearing by Operation of Law, 186 FERC ¶ 62,162 (2024)

186 FERC ¶ 62,162
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Tennessee Gas Pipeline Company, L.L.C.                Docket No. RP21-552-002

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW

(March 28, 2024)

Rehearing has been timely requested of the Commission's order issued on January 26, 2024, in this proceeding. *Tenn. Gas Pipeline Co.*, 186 FERC ¶ 61,069 (2024).

In the absence of Commission action on a request for rehearing within 30 days from the date it is filed, the request for rehearing may be deemed to have been denied. 15 U.S.C. § 717r(a); 18 C.F.R. § 385.713(f) (2023); *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

Debbie-Anne A. Reese,
Acting Secretary.